FILED
2013 Feb-21  PM 12:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| **RANDY JACKSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:11-cv-00016-AKK** |
| **DUNN CONSTRUCTION** | ) | |
| **COMPANY, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Randy Jackson pursues claims against Dunn Construction Company

("Dunn") for discrimination, retaliation, and hostile work environment under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and §

1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.  *See* doc. 1.  Jackson also

seeks relief under state law for alleged negligent supervisory practices which

purportedly led to the discriminatory environment.  Based on this court's review of

the evidence and the law, Jackson has presented sufficient evidence to survive

Dunn's motion for summary judgment, doc. 26, on his discriminatory discharge,

retaliatory discharge, and hostile work environment claims, and, accordingly, the

court **DENIES** the motion as it relates to these claims.  The motion is **GRANTED**

1

with respect to the state law claims and the federal discrimination claims based on disparate pay and denial of positions and uniforms.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising

from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiffs' favor when sufficient competent evidence supports Plaintiffs' version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II.  FACTUAL BACKGROUND

### A.  Jackson's Initial Employment with Dunn

Dunn Construction is involved in road construction and other heavy construction projects. Doc. 28-11 at 5. Dunn hired Jackson, an African-American

male, as a "tack driver" in September 2009.  Doc. 28-1 at 9.  Jackson made $13.00 per hour initially and later received a ten cent pay increase.  Docs. 28-2 at 14, 28-5 at 2.  As a "tack driver," Jackson drove a truck that sprayed hot liquid on the ground to allow asphalt to stick to the surface.  Doc. 28-1 at 9, 16. Although Jackson had no prior experience in the asphalt or construction industry, he had CDL and Hazmat certifications.  Doc.28-1 at 10; Doc.28-2 at 25-27.  As a new hire, Jackson underwent an orientation program that included training on Dunn's discrimination and harassment policies.  Doc. 28-1 at 14; Doc. 28-2 at 3, 32, 38.

On Jackson's first day, General Superintendent Billy Nichols assigned Jackson to work on the tack truck with Milton Ray, a Caucasian male.  Doc. 28-1 at 14, 16; Doc. 28-6 at 17; Doc. 28-7 at 4.  Allegedly, although Ray informed Jackson that training would last two or three weeks, Jackson's training only lasted three days.  Doc. 28-1 at 16.  Thereafter, Ray told Nichols that Jackson seemed uninterested, often slept in the truck, and had difficulty operating the equipment. Doc. 28-6 at 17; Doc. 28-7 at 4.  As a result, Nichols moved Jackson to a service driver position with assurances that he would eventually return Jackson to the tack truck.  Doc. 28-1 at 16-17; Doc. 28-6 at 18.  However, Nichols never returned Jackson to the tack driver position and instead gave the position to Van Mitchell, a Caucasian male who previously worked for Dunn.  Doc. 28-7 at 4-5.

4

In the service driver position, Jackson reported directly to Foreman Eugene Sanders, a Caucasian male, who in turn reported to Superintendent Wayne Snell, an African-American male.  Doc. 28-1 at 24.  Snell, in turn, reported to Nichols.  *Id.*  As a service driver, Jackson filled the service truck tanks with water and fuel, delivered the crew to the job sites, filled the equipment with fuel and water at the job sites, flagged and directed traffic, shoveled, and performed other tasks as directed.  Doc. 28-1 at 20, 23.  Although Jackson describes himself as an excellent truck driver, Snell rated Jackson as an average driver who "did good," but who received discipline for tardiness, a "no call/no show," and forgetting to fuel the service truck.  Doc. 28-1 at 24-25; Doc. 28-2 at 11, 39; Doc. 28-7 at 8-9.

## B.  Jackson's Interaction with Foreman Sanders

Jackson alleges that Sanders denied him restroom breaks "numerous times," called him "boy," and cursed him.  Doc. 28-1 at 27.  As an example of the alleged mistreatment, Jackson contends that when he told Sanders it was unfair for Sanders to make Jackson "sit and wait just to use the restroom," Sanders allegedly said "[y]ou mother fucker, you're going to wait until after I let you go to the bathroom, boy, and I hope you understand what I'm saying."  *Id.* at 30.  On another occasion, Sanders allegedly said that Jackson "needed to hurry up and get the goddamned truck, why am I taking so damn long."  *Id.*

5

Jackson complained to Snell that Sanders directed profanity at him, made him wait to use the restroom, and called him "boy" several times.  *Id*. at 31. Jackson also told Nichols about these incidents and added that he had second-hand information from an African-American employee named Greg, that Gerald, a Caucasian employee, "got mad at Sanders and told black employee Greg. . . that Sanders is not going to treat him like a nigger."  *Id*. at 32.  Also, Jackson purportedly asked Nichols to move him from Sanders and to assign him to one of several open dump truck driver positions.[1]  Doc. 28-1 at 33. Nichols allegedly refused and told Jackson that he needed Jackson in his current position and would eventually "try to do something."  *Id*.

## C.  Jackson's Discharge or Voluntary Resignation

Sometime in early April 2010, as a result of an employment application from Jackson, J&M Tank Lines contacted Dunn to request Jackson's safety performance history.  Doc. 28-3 at 32;  Doc. 28-5 at 7-10.  Sometime thereafter, Jackson purportedly told Nichols that "if he couldn't get this situation between [Sanders] and I under control or move me. . . I would consider leaving, but if he couldn't get it resolved that I will give a two-week notice and go, because, I mean, I was

---

[1] The dump truck driver position paid two or three dollars less per hour than the service driver position.  Doc. 28-7 at 27.

stressed out from this." Doc. 28-1 at 34. That afternoon or the next day, Sanders

told Jackson there was no need for him to work out his notice and for Jackson to

remove his things from the truck. Doc. 28-1 at 34. Jackson contends that Dunn

discharged him since he never resigned and had not decided to leave Dunn. Dunn

disagrees and asserts that Jackson relayed to Nichols that he had accepted another

job and wanted to turn in a notice, and that Nichols simply informed Jackson about

Dunn's policy against allowing employees to work out notices. Doc. 28-6 at 7.[2]

--------

[2] There is a dispute about the exact day of the discharge. Jackson alleges that Dunn
terminated him on the afternoon of his conversation with Nichols about potentially turning in
notice because of his complaints about Sanders. Doc. 32 at 11. Jackson also asserts that
"Dunn's time sheets show unequivocally the last day worked by [Jackson] was April 19[th]. . .In
fact, [Jackson] worked 11.5 hours on [Monday] the 19th." *Id*. at 12. However, Jackson's
deposition states:

> Q.     . . . The company's records show that your last day at Dunn Construction
> was April 19, 2010. Do you remember when you left Dunn?
> . . .
> A.     April 16, if I'm not mistaken was the day I was asked to remove my things
> out of the truck.
> Q.     . . . How do you remember it was the 16th?
> A.     Because it was on a Friday . . . And this particular Friday Mr. Sanders
> came back to the yard that day, and he walked up to me and asked me to clean my
> things out of the truck. And to be exact I think it was about 4:30 . . .
> . . .
> Q.     Okay. And earlier in the day had you talked to Mr. Nichols or Mr. Sanders
> about your employment?
> . . .
> A.     I think early that morning when I got to work, maybe like the day before or
> something, Eugene, had our differences again. . ., and I think I maybe told – said
> something to Billy Joe. . .
> . . .
> Q.     Okay. There's discussion in here about you telling Mr.Nichols you were
> considering turning in a two-week notice. Do you recall that?
> A.     . . . April the 15th, the day before the 16th – I told [Mr.Nichols] I would

**D. Jackson's EEOC Discrimination Charges**

Jackson filed his first charge of discrimination with the Equal Employment

Opportunity Commission on April 19, 2010[3], alleging discrimination based on (1)

the decision to transfer him from the tack truck and to give the position to Larry, a

Caucasian male, (2) Nichols' promise to return him to the tack truck but later

giving an open position to Van Mitchell, (3) Sanders' racial harassment, (4) second

hand information about a Caucasian employee using the "n" word and Sanders'

failure to satisfactorily reprimand the employee, and (5) the failure to give Jackson

uniforms or a raise after his 90 day probationary period.  Doc. 28-5 at 1-2.  Jackson

subsequently amended his charge to add a retaliation claim.   Doc. 28-5 at 3.

Specifically, Jackson alleged that after Dunn received his first charge, Sanders

harassed him constantly and Dunn terminated him in retaliation "for having

complained of discriminatory employment practices of [Dunn], and for filing a

charge of discrimination with the EEOC."[4]  *Id.*

---

consider leaving.

Doc. 28-1 at 34-35.  The court, therefore, presumes Dunn discharged Jackson on Friday April 16th, the day after Jackson purportedly discussed resignation with Nichols.

[3] Although Jackson's charge is dated April 16, 2010, it appears that he formally filed it with the EEOC on the 19th.  *See* doc. 28-5 at 1-2.

[4] Apparently, Jackson's counsel sent Dunn the charge on Monday April 19th.  However, Judith Torres asserts that Dunn actually received it the following morning because Jackson's counsel sent the charge by facsimile a couple of hours after closing.  Doc. 28-8 at 2-3; Doc. 28-

### III. ANALYSIS

Jackson raises claims under federal and state law – racial discrimination and retaliation in violation of Title VII and § 1981, and a state law claim for negligent hiring, supervision, training and retention.[5]   Doc. 1. More specifically, Jackson contends that he was "denied pay, denied uniforms, denied positions, unjustly reprimanded, harassed and terminated" because of his race and in retaliation for engaging in protected activity.  Doc. 1 at 7, 9.  For the state law claim, allegedly Dunn "negligently hired, trained, supervised and retained Caucasian and [sic] employees, managers, and supervisory employees, who subjected [Jackson] to harassment, discrimination and a hostile environment . . . and failed to investigate and prevent harassment and discrimination in the work place."  Doc.1 at 11. The court will discuss first the federal claims, and then the state law claim.

### A.      Federal Claims

Jackson contends that Dunn discriminated and retaliated against him by denying him pay, positions, and uniforms, unjustly disciplining him, harassing him, and ultimately discharging him.  Doc. 1. However, Jackson only addresses the discriminatory discharge, retaliatory discharge and hostile work environment

---

12 at 1-2.

[5] The court dismissed Jackson's intentional infliction of emotional distress claim.  *See* doc. 20.

claims in his brief opposing summary judgment.  *See generally* doc. 32.  Since Jackson failed to address Dunn's arguments with respect to his allegations of discrimination and retaliation based on disparate pay, positions, discipline and uniforms, the court presumes Jackson has abandoned these claims.  Moreover, the court finds Dunn's arguments persuasive and that, based on the record before it, no reasonable jury could find in favor of Jackson on these claims.  *See United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *Walker*, 911 F.2d at 1577.   Therefore, the court **GRANTS** Dunn's motion on the Title VII and § 1981 claims based on disparate pay, positions, discipline and uniforms.

Applying the same analytical framework to Title VII and § 1981 race discrimination claims, *see Cooper v. Southern Co.*, 390 F.3d 695, 724-25 (11th Cir. 2004), the court turns now to Jackson's remaining allegations of discriminatory discharge, retaliatory discharge, and hostile work environment.

1.    Discriminatory Discharge

Title VII "makes it unlawful for an employer to 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.'"  *Brown v. Ala.  Dep't Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (quoting 42 U.S.C. § 2000e-2(a)(1)).

10

Implicit in a claim for race discrimination is the contention that racial animus factored in the adverse employment action, and "a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence.  The analytical framework and burden of production varies depending on the method of proof chosen." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.  1998).

Where, as here, a plaintiff relies on circumstantial evidence, *see generally* doc. 32, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6]  Under this framework, the plaintiff must first create an inference of discrimination by establishing a prima facie case of discrimination. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir.  2006) (citation omitted).  If the plaintiff satisfies his initial burden, "then the defendant must show a legitimate, non-discriminatory reason for its employment action. . . . If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id*. (citation omitted).  In

---

[6] Although Jackson alleges that Sanders called him "boy" and subsequently discharged him, the use of the term is not in itself direct evidence of discrimination since it was not directly related to the discharge.  "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard*, 161 F.3d at 1330 (internal citations omitted).

other words, assuming the plaintiff establishes a prima facie case, and the defendant provides a legitimate, non-discriminatory reason for the adverse employment action, to show pretext, the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). "The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id*. (internal quotation marks and citations omitted). However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007)(citation omitted).

Dunn challenges Jackson's discriminatory discharge claim on two grounds: that Jackson failed to establish a *prima facie* case or that Dunn's articulated reason for the discharge is pretextual.

12

a.   *Prima Facie Case of Discrimination*

"To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler*, 447 F.3d at 1323.  Dunn challenges only the third element and asserts that Jackson cannot establish disparate treatment because Jackson failed to identify an employee outside the protected class that Dunn purportedly treated more favorably than Jackson.  Doc. 27 at 14.  Jackson disagrees and asserts that under *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), he has raised significant circumstantial evidence to support his discriminatory discharge claim even without a comparator.  Indeed, when a plaintiff fails to identify an adequate comparator to satisfy the elements of the *McDonnell Douglas* framework, he may still survive summary judgment "if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Smith*, 644 F.3d at 1328, citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer

13

intentional discrimination by the decisionmaker." *Id*. (internal quotation marks and citations omitted).  This is precisely the case here in light of Jackson's testimony that Sanders called him "boy" over 200 times and failed to discipline a Caucasian employee who used the "n" word, and that Dunn discharged him after he complained that Sanders' conduct created a stressful environment for him and would force him to accept other employment if Dunn failed to address his complaints.  Doc. 28-1 at 34, 43.  These facts are sufficient to create a *prima facie* case even in the absence of a comparator.  After all, "[d]emonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

### b.     *Pretext for Discrimination*

In light of Jackson's *prima facie* case, the burden shifts to Dunn to articulate a valid non-discriminatory reason – which Dunn did through its assertion that it discharged Jackson because Jackson accepted another job and submitted a two week notice.  Doc. 28-6 at 7; Doc. 28-9 at 13.  These reasons initially satisfy Dunn's burden under the *McDonnell Douglas* framework because a defendant "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason." *Standard*,

14

161 F.3d at 1331.  "In light of this, [Jackson] must now create a genuine issue of

material fact as to whether the reasons advanced are pretextual.  In other words,

[Jackson] must provide sufficient evidence to allow a reasonable fact finder to

conclude that the proffered reasons were not actually the motivation for his

discharge."  *Id*. at 1332.

To rebut Dunn's asserted reason for his discharge, Jackson alleges that he

never intended to resign and that the disputed fact as to whether he gave notice

prevents summary judgment.  Doc. 32 at 17. The facts, taken in a light most

favorable to Jackson, show that Jackson had a conversation with Nichols regarding

resignation after Dunn learned about Jackson's efforts to find another position.

Doc. 28-1 at 34,37; Doc. 28-3 at 32; Doc. 28-5 at 7-10.  This would normally give

Dunn a good faith basis to believe Jackson intended to resign.  However, Jackson

alleges that he made it clear to Nichols that he planned to stay at Dunn if Nichols

could resolve Sanders' alleged racial discrimination and harassment: "if he couldn't

get this situation between Eugene and I under control or move me . . . I would

consider leaving, but if he couldn't get it resolved that I will give a two-week

notice and go, because, I mean, I was stressed out from this."  Doc. 28-1 at 34.

That same day or the next day, Dunn, through Sanders – the individual Jackson had

just complained about – told Jackson to leave at the end of his shift.  Doc. 28-1 at

34.

Giving Jackson the inferences he is due as the non-movant, the court disagrees with Dunn that it acted based on a mistaken belief about Jackson's intention to resign.  To reach this conclusion, the court would have to ignore Jackson's contention that he purportedly told Nichols that he wanted to stay at Dunn and would stay if Nichols addressed Jackson's complaints regarding Sanders and conclude instead that Dunn presented a more credible version of the facts. Making such a determination would result in clear error since it is hornbook law that a court cannot make credibility determinations at the summary judgment stage. *Hardin v. Pitney-Bowes Inc.*, 451 U.S. 1008, 1008 (1981) ("It has long been established that it is inappropriate to resolve issues of credibility. . . on motions for summary judgment.") (Rehnquist, J. dissenting).  Ultimately, whether Dunn acted reasonably in discharging Jackson based on a mistaken belief that Jackson had, in fact, resigned, or that Jackson was not sincere when he conveyed that he would stay if Dunn addressed his concerns, is an issue for a jury to decide. Therefore, Dunn's motion on the race discharge claim is **DENIED**.

    2.    <u>Retaliatory Discharge</u>

"Retaliation is a separate offense under Title VII" that seeks to "prevent an employer from interfering (through retaliation) with an employee's efforts to secure

or advance enforcement of the Act's basic guarantees, including freedom from race discrimination." *Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx.  513, 519 (11th Cir.  2007) (internal quotation marks and citations omitted).  "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." *Id.* (*quoting Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  Thus, a plaintiff asserting a retaliation claim initially need only show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).   "'These three elements create a presumption that the adverse action was the product of an intent to retaliate . . . . [T]he burden of production [then] shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action . . . . After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions.'" *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009)).

Dunn contends that the retaliation claim fails because Jackson purportedly

(1) did not engage in protected activity, (2) cannot prove a causal connection between his EEOC complaint and his discharge,[7] and (3) cannot rebut Dunn's legitimate non-discriminatory reason for discharge.  The court addresses each contention below.

a.      *Protected Activity*

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has . . . *participated* in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added).  Thus, Title VII's retaliation provision protects two distinct employee activities, participation and opposition, but affords a different level of protection to each.  *See E.E.O.C. v. Total System Servs., Inc.*, 221 F.3d 1171, 1175 (11th Cir. 2000).  The participation clause is not applicable here because it "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC." *Id.*

---

[7] Dunn is correct about the EEOC charge. The parties dispute whether Dunn discharged Jackson on April 16 or 19, 2010.  *See* n.2, *supra*.  However, the evidence indisputably shows that Dunn received Jackson's EEOC charge after 5:00 p.m. on April 19th and that no one at Dunn saw the charge until the following morning.  Doc. 28-8 at 2-3; Doc. 28-11 at 1-3, 25-26; Doc. 28-12 at 1-2. Given these undisputed facts, Jackson cannot claim that his EEOC charge is causally related to his discharge.  However, this fact is not fatal to Jackson's retaliation claim since his other protected activity has a causal relation to his discharge.

at 1174.  Again, Dunn received notice of Jackson's EEOC charge *after* it discharged Jackson.  *See* n.7, *supra*.  Therefore, Jackson cannot claim that Dunn discharged him based on his "participation" in an EEOC proceeding against Dunn.

The opposition clause is more broad because those acts "are taken outside of the context of a government review and, instead, are taken in the context of the ordinary business environment[.]"  *Total System Servs., Inc.*, 221 F.3d at 1176. Dunn alleges that Jackson did not engage in protected activity because Jackson failed to show that he opposed Dunn's conduct based on a subjectively and objectively reasonable belief that Dunn had engaged in unlawful employment practices.  Doc. 27 at 29, citing *Little v. United Techs, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  Specifically, Dunn alleges that Jackson's belief was not objectively reasonable and that "Jackson only complained about Sanders using the word 'boy' one time and a second hand hearing of the 'n' word[, but] Eleventh Circuit precedent makes clear that merely reporting these two comments could not be considered to be a report of conduct violating Title VII as a matter of law."  *Id*.

Dunn's argument misses the mark for several reasons.  First, by focusing solely on the specific examples of potentially discriminatory conduct Jackson mentioned in his deposition, Dunn ignores that Jackson asserts that Sanders called

him boy "over two hundred times," that Sanders refused to allow him to take restroom breaks "numerous times," that Sanders used profanity towards him on multiple occasions, that Sanders failed to reprimand another employee who used the "n" word in the presence of an African-American employee, and, critically, that Jackson claims he complained about Sanders several times to Nichols and Snell. *See* doc. 28-1 at 29-34, 43.  Second, Dunn also ignores that Jackson stated he complained about Sanders to Nichols the same day, or the day before, Sanders told him to clean out his things.  Again, Jackson alleges that he told Nichols that Sanders' alleged harassment and discrimination created a stressful environment and that he would leave Dunn if Nichols could not redress the situation.  Doc. 28-1 at 34.  Critically, Jackson made clear that he wanted to stay at Dunn and hoped Nichols would address Sanders' conduct or move him to another supervisor.  *Id*. Contrary to Dunn's contention, this statement to Nichols is a quintessential example of a complaint and protected activity. Given these facts, the court disagrees with Dunn that Jackson's belief about unlawful employment practices was objectively unreasonable.  To the contrary, Jackson's contentions about the alleged conduct and his purported multiple complaints are sufficient evidence that he opposed the alleged conduct based on a subjectively and objectively reasonable belief that Sanders' conduct constituted an unlawful employment practice.

Moreover, Jackson's complaints are sufficient "opposition" to warrant protection under Title VII's anti-retaliation provision.

    b. *Causal Connection*

   Dunn contends next that, even if Jackson engaged in a protected activity, he cannot prove a causal connection between that activity and his separation from Dunn.  Doc. 27 at 31.  Generally, a plaintiff can satisfy the causation prong by "prov[ing] that the protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir. 1994)(internal citation and quotation mark omitted).  A plaintiff can usually establish this by "demonstrating that there is a 'close temporal proximity' between the employer's awareness of the protected activity and the adverse employment action."  *Hankins*, 237 Fed. Appx. at 520.

   Dunn does not dispute the temporal proximity between Jackson's discharge and his last complaint about Sanders.  Instead, relying on *Hankins*, Dunn asserts that the proximity  "standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity."  *Id*. at 520.  Dunn's reliance on *Hankins* is misplaced because the court in *Hankins* found that the plaintiff's intervening misconduct broke the causal connection between her protected activity and subsequent discharge.  *See id.* at 520-21.  There is no

intervening conduct here.  Although Dunn asserts that Jackson's apparent resignation breaks the causal connection, the court cannot ignore that Jackson denies resigning or that Dunn purportedly discharged Jackson soon after he told Nichols he wanted to stay at Dunn but would leave if Nichols failed to address Jackson's concerns about Sanders' discriminatory and harassing conduct.  In contrast, in *Hankins* the intervening misconduct occurred *five days* after the plaintiff's complaint and the discharge occurred *fifteen days* later.  *See id.* at 521.  While temporal proximity may not always be sufficient evidence of causation, where, as here, the employer purportedly discharged an employee within hours or a day after he complained about alleged discriminatory conduct, the stress it caused, and how it may lead him to resign if not addressed, the facts are sufficient circumstantial evidence that "prove that the protected activity and the negative employment action are not completely unrelated."  *Meeks*, 15 F.3d at 1021.

        *c.*    *Pretext*

Finally, Dunn asserts that Jackson "has failed to offer any evidence to suggest that Dunn Construction's stated reasons for its [discharge] are a pretext for discrimination or retaliation."  Doc. 27 at 32.  The court notes first that Dunn satisfied its burden under the *McDonnell Douglas* framework by "produc[ing] evidence that could allow a rational fact finder to conclude that [Jackson's]

22

discharge was not made for a discriminatory reason." *Standard*, 161 F.3d at 1331.

Namely, that it discharged Jackson because of a purported reasonable belief that

Jackson intended to resign.  However, Jackson has presented sufficient

circumstantial evidence "to allow a reasonable fact finder to conclude that the

proffered reasons were not actually the motivation for his discharge." *Id*. at 1332.

Specifically, the temporal proximity between Jackson's complaint to Nichols about

Sanders and discharge creates a genuine issue of material fact as to whether Dunn

discharged Jackson in retaliation for his opposition of Sanders' discriminatory

practices or because Jackson purportedly turned in a two-week notice.  Therefore,

Dunn's motion on the retaliatory discharge claim is **DENIED**.

    3.    <u>Hostile Work Environment</u>

"An employer is subject to vicarious liability to a victimized employee for an

actionable hostile environment created by a supervisor with immediate (or

successively higher) authority over the employee." *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 806 (1998).  To establish a *prima facie* case of hostile work

environment in the form of racial harassment, Jackson must demonstrate: (1) that

he belongs to a protected group; (2) that he was subjected to unwelcome

harassment; (3) that the harassment was based on his race; (4) that the harassment

was sufficiently severe or pervasive to alter the terms and conditions of

employment and create a racially abusive work environment; and (5) a basis for

holding the employer liable. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d

1269, 1275 (11th Cir. 2002); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238,

1245 (11th Cir. 1999) (en banc).  Such a showing arises only where the racial

harassment is so "severe or pervasive" as to "alter the conditions of employment

and create an abusive working environment." *Faragher v. City of Boca Raton*, 524

U.S. 775, 786 (1998) (citation and internal quotation marks omitted).  In reaching

this determination, courts consider the frequency of the conduct, the severity of the

conduct, whether the conduct is threatening or humiliating or a mere offensive

utterance, and whether the conduct unreasonably interferes with the plaintiff's

performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Edwards v.

Wallace Cnty. Coll.*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

The standard is "sufficiently demanding to ensure that Title VII does not

become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted).

For example, offhand comments, isolated incidents (unless extremely serious), and

other similar tribulations of the workplace will not amount to changes altering the

terms and conditions of employment. *Id*.  Rather, to succeed, a plaintiff must show

the existence of an abusive work atmosphere or one "charged with racial hostility."

*Edwards*, 49 F.3d at 1521 (citation and internal quotation marks omitted).

24

Furthermore, to be actionable, the work environment must be offensive on both an objective[8] and a subjective level.  That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher*, 524 U.S. at  787.  This determination is based on the totality of the circumstances.  *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

> a.    *Severe and Pervasive*

Dunn challenges Jackson's hostile work environment claims based on the severe or pervasive requirement.  According to Dunn, no reasonable jury could find that a single use of the "n" word, especially when made outside Jackson's presence, coupled with being called "boy" a few times, created a racially hostile environment.  Doc. 27 at 21. This assertion ignores that the court must view the facts in a light most favorable to Jackson.  Again, Jackson contends that Sanders called him "boy" "over two hundred times" in an eight month period and engaged in other conduct, such as refusing to allow Jackson to use the restroom, that a jury may find to constitute racial harassment.  *See* doc. 28-1 at 43.  Moreover, Dunn's

---

[8]The objective evaluation is based on a "reasonable person" standard. *Watkins v. Bowden*, 105 F.3d 1344, 1355-56 (11th Cir. 1997) (affirming the use of the "reasonable person" standard in a hostile work environment claim where the plaintiff argued that the court should have applied a more contextual standard such as "a reasonable African-American person").

assertion that calling an African-American male "boy" a few times cannot create a hostile environment ignores the history of this offensive epithet.  *See e.g., Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1142 (10th Cir. 2008) ("As typically used in everyday English, there is nothing inherently offensive about the word 'boy.' Nevertheless, it is a term that has been used to demean African-American men, among others, throughout American history."); *Bailey v. Holland, Inc.*, 2007 WL 470439 at *10 (M.D. Tenn. 2007) ("With regard to historical usage, the court takes judicial notice of the fact that, from the time of slavery, the term 'boy' was used in reference to African-American men in a demeaning, insulting manner."); *Hernandez v. Communications Unlimited of the South, Inc.*, 2005 WL 3803064 at *6 (M.D. Ala. 2005) ("[T]he word 'boy' can be quite endearing if shared between a parent and a son and yet, as the history of this country regrettably teaches, racially offensive and even explosive if said in a derisive and humiliating manner by a white person to a black adult male.").  As the Supreme Court recognized, "[a]lthough it is true that the disputed word [boy] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).  Determining what the speaker here meant when he

purportedly called Jackson "boy" over 200 times is a matter for the trier of fact since it will involve an evaluation of the context and other factors to ascertain whether the usage was benign or designed to demean and harass Jackson because of his race.  Finally, while Jackson's knowledge of Sanders' failure to reprimand a Caucasian employee for using the "n" word may not, standing alone, be sufficient to establish a hostile work environment claim, when viewed in conjunction with the other evidence, it lends credence to Jackson's assertion that the workplace was "charged with racial hostility." *Edwards*, 49 F.3d at 1521.

Based on the totality of the circumstances, the court finds that Jackson has established that Sanders subjected him to severe or pervasive harassment and created an environment that "a reasonable person would find hostile or abusive, and one that [Jackson] in fact did perceive to be so." *Faragher*, 524 U.S. at 787. Therefore, Jackson has established a *prima facie* case.

b.      The Faragher Defense

Dunn argues alternatively that Jackson's hostile work environment claim fails because Dunn "(a) . . . exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 806;

27

Doc. 27 at 24-25 .  Unfortunately for Dunn, *Faragher* is clear that "[n]o affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge[.]"  524 U.S. at 808.  By Dunn's own admission, Sanders, the alleged harasser, played a role in Jackson's discharge because Nichols testified that, although he had the final conversation with Jackson regarding potential resignation, he planned to consult with Sanders prior to determining whether to discharge Jackson.  Doc. 28-6 at 7.  Indeed, shortly thereafter, Sanders instructed Jackson to clear his belongings and leave.  Doc. 28-1 at 34.  Under these facts, it appears that Sanders is at least partially responsible for the purported discharge.  Therefore, because a factual dispute exists regarding whether Jackson resigned or was discharged, and, if the latter, whether Sanders had any role in the discharge, the court is precluded from dismissing Jackson's hostile work environment claim based on the *Faragher* defense.  Accordingly, Dunn's motion on the harassment claim is **DENIED**.

## B.    Claims Under Alabama Law

Finally, Jackson alleges in count three that Dunn is liable under state law because it "negligently hired, trained, supervised and retained Caucasian . . . employees, managers, and supervisory employees, who subjected Plaintiff to harassment, discrimination and a hostile environment based on his race, disability

and/or perceived disability, and failed to investigate and prevent harassment and discrimination in the work place." Doc. 1 at 11. Dunn asserts that it is due summary judgment on this claim because Jackson dismissed his underlying tort claim of intentional infliction of emotional distress. Doc.27 at 32-33, citing *Thrasher v. Ivan Leonard Chevrolet*, 195 F. Supp. 2d 1314, 1319 (N.D. Ala. 2002); *Taylor v. Stevenson*, 820 So. 2d 810, 812 (Ala. 2001). Dunn is correct that "[i]n order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a . . . tort." *Thrasher*, 195 F. Supp. 2d at 1320. The dismissal of Jackson's underlying tort is fatal to his remaining state law claim and summary judgment is, therefore, **GRANTED** as to this claim.

## IV.  CONCLUSION

In sum, Dunn's motion for summary judgment on Jackson's discriminatory discharge, retaliatory discharge, and hostile work environment claims is **DENIED**, but **GRANTED** as to all of Jackson's remaining claims.

**DONE** this 21st day of February, 2013.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE